IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

CARL E. LEE,

       Plaintiff,

vs.                              CASE NO. 1:15-cv-78-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security

       Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Acting

Commissioner of Social Security (the "Commissioner") denying Plaintiff's

application for disability insurance benefits and supplemental security

income ("SSI") benefits pursuant to Title II and Title XVI, respectively, of

the Social Security Act ("the Act"). (ECF No. 1.) The Commissioner has

answered (ECF No. 9), and both parties have filed briefs outlining their

respective positions. (ECF Nos. 14 &15.) For the reasons discussed below,

it is recommended that the Commissioner's decision be affirmed.

## I.  PROCEDURAL HISTORY

Plaintiff protectively filed his application for disability insurance

benefits under Title II and SSI benefits under Title XVI on March 28, 2012,

alleging a disability onset date of March 5, 2011. (R. 230–48.) Plaintiff

alleged several impairments, including heart, back, and hip problems, as

well as hypertension. (R. 262.) His applications were denied initially and

upon reconsideration. (R. 84–85, 112–13.) Following a hearing on

September 18, 2013, an administrative law judge ("ALJ") issued a decision

unfavorable to Plaintiff on October 23, 2013. (R. 11–49.) The Appeals

Council denied Plaintiff's request for review on February 26, 2015. (R.

1–6.) On April 24, 2015, Plaintiff filed the instant appeal to this Court. (ECF

No. 1.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by

substantial evidence. *See* 42 U.S.C. § 405(g) (2000). Substantial evidence

is more than a scintilla, i.e., the evidence must do more than merely create

a suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the

conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing

*Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), *Richardson v.*

*Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971));

*accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial

evidence, the district court will affirm, even if the reviewer would have

reached a contrary result as finder of fact, and even if the reviewer finds

that the evidence preponderates against the Commissioner's decision.

*Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358

(11th Cir. 1991). The district court must view the evidence as a whole,

taking into account evidence favorable as well as unfavorable to the

decision. *Foote*, 67 F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835,

837 (11th Cir. 1992) (holding that the court must scrutinize the entire

record to determine reasonableness of factual findings); *Parker v. Bowen,*

793 F.2d 1177 (11th Cir. 1986) (finding that the court must also consider

evidence detracting from evidence on which the Commissioner relied).

However, the district court will reverse the Commissioner's decision on

plenary review if the decision applies incorrect law, or if the decision fails to

provide the district court with sufficient reasoning to determine that the

Commissioner properly applied the law. *Keeton v. Dep't Health & Human*

*Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful

activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005).[1] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

The ALJ must follow five steps in evaluating a claim of disability. 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is working at a substantial gainful activity, he is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520(d).

---

[1] All further references to 20 C.F.R. will be to the 2005 version, unless otherwise specified.

Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled. 20 C.F.R. § 404.1520(f).

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2.[2] The

_____

[2] In *Doughty* the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.

*Id.* (internal citations omitted).

Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled. *Walker*, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion." *Wolfe v. Chater*, 86 F.3d 1072, 1077 ( 11th Cir. 1996). *See Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999); *Walker*, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation."). In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment. *Walker*, 826 F.2d at 1003.

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform. *Wolfe*, 86 F.3d

at 1077–78. Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence. *See id.* Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner. *Hale v. Bowen,* 831 F.2d 1007, 1011 (11th Cir. 1987).

## III.  SUMMARY OF THE RECORD

## A.  Medical Evidence

Plaintiff claims that he can no longer work due to back pain, chest pain, shortness of breath, and fatigue, all of which impedes his ability to stand, walk, and lift. (R. 269–70, 282, 288.) Although Plaintiff claims an onset date of March 5, 2011, Plaintiff's medical records do not begin until February 6, 2012, when he saw Stephen Falkowski, D.O. ("Dr. Falkowski") at the Palms Medical Center. Dr. Falkowski assessed Plaintiff with hypertension and obesity. (R. 311–14.) Notably, however, Dr. Falkowski opined that Plaintiff "appears to be a suitable candidate for being a Foster Parent." (R. 312.)

On February 17, 2012, Plaintiff visited The Institute of Cardiovascular Excellence ("TICE") for right leg pain radiating from his hip to foot,

rendering him barely able to walk. (R. 307.)  He reported a history of

hypertension, chest pain, and leg discomfort. (*Id.*) The examination

revealed that Plaintiff was in no apparent distress, had a regular heart rate,

and had no edema. (R. 308.) The notes include the following impressions:

(1) abnormal electrocardiogram ("EKG"); (2) family history of coronary

artery disease ("CAD"); (3) hypertension; (4) hyperlipidemia; and (5) right

leg discomfort. (*Id.*) A stress test and echo doppler were ordered based on

Plaintiff's examination. (*Id.*)

Plaintiff underwent a gated myocardial perfusion spect/treadmill test

on February 29, 2012, performed by Asad Qamar, M.D. ("Dr. Qamar"). (R.

309, 327.)  The report noted symptoms of angina.[3] (*Id.*) At sub maximal

stress, Plaintiff's blood pressure was 150/90 due to his heart rate

medication. (*Id.*) Dr. Qamar found a moderate perfusion abnormality in the

inferior lateral wall(s) demonstrating scarring and a 72% ejection fraction

---

[3] "Angina is chest pain or discomfort caused when your heart muscle doesn't get enough oxygen-rich blood." American Heart Association, Inc., *Angina (Chest Pain)* (Mar. 23, 2016), http://www.heart.org/HEARTORG/Conditions/HeartAttack/SymptomsDiagnosisofHeartAttack/Angina-Chest-Pain_UCM_450308_Article.jsp#.VxER-UY00ec.

("EF").[4] (*Id.*) The findings included leg tightness and shortness of breath. (R. 309.) Dr. Qamar noted that Plaintiff had a hypertensive response to exercise, and non-specific ST and T wave changes on the EKG. (R. 327.)

Several days later, on March 13, 2012, Dr. Qamar performed an echocardiogram. (R. 328.) The echocardiogram revealed a 45% EF. (*Id.*) With the exception of mild left ventricular hypertrophy and a mildly dilated left atrium, all other findings were normal. (R. 329.) Dr. Qamar concluded that Plaintiff had mild left ventricular hypertrophy, reduced left ventricular systolic function, and mild diastolic dysfunction of the left ventricle. (*Id.*)

Plaintiff went for a follow-up visit at TICE on March 9, 2012 to discuss the results of his stress test. (R. 323.)  He reported chest pain "every now and then" and hip pain that "acts up from time to time." (*Id.*) The notes

_____

[4] "The Ejection Fraction compares the amount of blood in the heart to the amount of blood pumped out. The fraction or percentage helps describe how well the heart is pumping blood to the body." American Heart Association, Inc., *HF and Your Ejection Fraction Explained* (2015), http://www.heart.org/idc/groups/heart-public/@wcm/@hcm/documents/downloadable/ucm_481884.pdf. "A normal heart's ejection fraction may be between 50 and 70. You can still have a normal ejection fraction reading and still have heart failure . . . ." American Heart Association, Inc., *Ejection Fraction Heart Failure Measurement* (Apr. 6, 2015), http://www.heart.org/HEARTORG/Conditions/HeartFailure/SymptomsDiagnosisofHeart Failure/Ejection-Fraction-Heart-Failure-Measurement_UCM_306339_Article.jsp#.VxAI8 0Y00ec. "A measurement under 40 may be evidence of heart failure or cardiomyopathy. An EF from 41 to 49 may be considered 'borderline' but does not always indicate that a person is developing heart failure. It may indicate damage, perhaps from a previous heart attack." *Id.*

disclose that Plaintiff had an abnormal stress test and abnormal EKG. (R. 324.) Plaintiff was prescribed propranolol. (*Id.*)

Plaintiff then underwent a left heart catheterization at TICE on May 9, 2012. (R. 331.) The notes show a slow flow in the left anterior descending artery and a 50% EF. (*Id.*) Plaintiff was diagnosed with mild coronary artery disease. (*Id.*)

Plaintiff returned to TICE for another follow-up on May 18, 2012, during which he reported that he was not having any more episodes of chest pain. (R. 321.) The notes include the following impressions: (1) mild CAD; (2) hypertension; (3) hyperlipidemia; (4) chronic back pain; and (5) leg/hip discomfort. (R. 322.) Plaintiff was prescribed pravastatin, niaspan, and baby aspirin.

Next, on July 3, 2012, Plaintiff was seen at the Levy County Health Department ("LCHD") on July 3, 2012. (R. 348.) He reported feeling fatigued but denied having cardiovascular pain, irregular heartbeat, lightheadedness, or difficulty breathing. (R. 348–49.) Plaintiff's cardiovascular rate and rhythm were normal with no murmurs. (R. 350.) Plaintiff had full range of motion in all extremities, had 5/5 muscle strength

in all extremities, and had no joint abnormalities or swelling. (R. 351.)  He was diagnosed with chronic ischemic heart disease, unspecified. (*Id.*) His propanolol prescription was changed to metoprolol, but all other medications were continued without changes. (*Id.*) Notably, during his exam, Plaintiff reported exercising 30 minutes at least three times per week. (R. 355.)

At a follow-up visit to the LCHD on November 19, 2012, Plaintiff's breath sounded clear and equal bilaterally, and Plaintiff had a normal cardiovascular rate and rhythm with no murmurs. (R. 365–66.)  He denied anginal symptoms. (R. 368.) Plaintiff was diagnosed with pure hypercholesterolemia and his pravachol was increased. (R. 366.) He was also re-diagnosed with unspecified chronic ischemic heart disease, but was given the "green light to be active physically," and was encouraged to walk and do yard work. (R. 367.) The LCHD notes even include goals of losing 20 pounds and moderately exercising. (R. 365.)

On May 6, 2013, however, Plaintiff presented to LCHD complaining of knifelike pains to the chest that subsided suddenly on their own and made him feel sleepy afterwards. (R. 385.) His cardiovascular rate and

rhythm were, however, normal and no murmurs were heard. (R. 386.)
Plaintiff was diagnosed with unspecified chest pain and was prescribed
naproxen for the chest pain. (*Id.*) Then, at his follow-up on June 3, 2013,
Plaintiff reported that the chest pain resolved shortly after beginning
naproxen and had not recurred. (R. 388.)  Plaintiff was advised to stop the
naproxen and observe his symptoms. (R. 389.)

## B.  Opinion Evidence

### 1.  *Dr. Qamar*

On May 18, 2012, Dr. Qamar completed a cardiac residual functional
capacity ("CRFC") questionnaire for Plaintiff. (R. 334–38.) Dr. Qamar noted
that Plaintiff's symptoms were chest pain, shortness of breath, fatigue, and
back pain. (*Id.*) Dr. Qamar's diagnoses included mild CAD, hypertension,
hyperlipidemia, and chronic back pain. (*Id.*) He also noted that Plaintiff had
an EF of 45-50%. (*Id.*) According to the assessment, Plaintiff's anginal pain
had resolved after a recent catherization, but Plaintiff did have some
discomfort with exertion in the mid sternal area. (R. 335.) Dr. Qamar found
that Plaintiff had a marked limitation of physical activity and was capable of
low stress jobs that did not require extensive physical exertion. (*Id.*)

Due to Plaintiff's back pain, however, Dr. Qamar found that Plaintiff could stand for 30 minutes and would sometimes need to take unscheduled breaks during an 8-hour work-shift. (R. 336.) Further, Dr. Qamar found that Plaintiff occasionally could lift or carry less than 10 pounds and could rarely twist, bend, crouch, or climb ladders or stairs. (R. 337.)  According to Dr. Qamar, Plaintiff would have to miss more than four days of work per month as a result of his impairments. (R. 338.)

Then, in July 2012, Dr. Qamar completed a treating source cardiac questionnaire. (R. 341–44.) The questionnaire disclosed that Plaintiff should avoid lifting over 10 pounds and should not exert himself to cause chest pain. (R. 341.) Further, Dr. Qamar noted that Plaintiff had occasional chest pain with exertion and that a current exercise cardiac stress test was not contraindicated. (*Id.*)

### 2.  Dr. Patel

On August 10, 2012, Sunita Patel, M.D. ("Dr. Patel"), a Disability Determination Services consultant, completed a physical residual functional capacity assessment ("PRFCA") for Plaintiff. Dr. Patel reviewed Plaintiff's medical records and opined that Plaintiff occasionally could

lift/carry 20 pounds, frequently lift/carry 10 pounds, stand and/or walk for 6 hours, sit for 6 hours, and otherwise had no pushing and/or pulling limitations. (R. 92.)  Further, Dr. Patel concluded that Plaintiff should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, fumes/odors/dusts/gases/poor ventilation, and hazards. (R. 93–94.)

In rendering her PRFCA, Dr. Patel acknowledged Dr. Qamar's more restrictive opinion, noting, however, that Dr. Qamar's "opinion is without substantial support from other evidence of record, which renders it less persuasive." (R. 94–95.) Dr. Patel concluded that Plaintiff could perform light work. (R. 96.)

## C.  Hearing Testimony

Plaintiff was 49 years old on the onset date, and by the time of the hearing on September 18, 2013, he was 51 years old. (R. 32.)  Plaintiff stated that he does not have the same energy he used to have and gets out of breath easily. (R. 35.) Plaintiff testified that he has chest pain about twice a day three or four days per week. (*Id.*) The chest pain requires Plaintiff to sit and relax which causes him to fall asleep. (*Id.*) Plaintiff says

that the chest pain and shortness of breath get worse with exertion. (R. 35–36.) Plaintiff stated he just started Naproxen for the chest pain but that it had only been approximately two weeks since he started the medication and so far the medication had not done anything to help. (R. 41.)

Plaintiff's daily activities include letting the dog out, then going outside and "piddling" around, such as transplanting his wife's flowers. (R. 36.)  Plaintiff says that eventually he gets tired and out of breath and needs to sit down. (*Id.*)  After he rests Plaintiff is able to go outside again to do more work. (*Id.*) Plaintiff said he usually sleeps for about two to three hours during an eight-hour period. (R. 37.)  On a bad day Plaintiff's chest and back hurt, sometimes his arms  tingle and go numb, and he hurts from the waist up. (R. 39–40.) Plaintiff says that he spends most of the bad days in bed. (R. 39.)

Walking makes Plaintiff's symptoms worse. (R. 37.)  He can walk approximately one block to the mailbox and back, but if he does too much his symptoms get worse. (*Id.*) Plaintiff also testified that sitting is also problematic. (R. 38.) If Plaintiff sits too long his back starts hurting so he has to stand up. (*Id.*) Then, when Plaintiff stands up, if he stands for too

long his back becomes painful and he has to sit back down. (*Id.*)

Although Plaintiff has a driver's license, he only drives on the first of the month to pay bills and avoids driving after that unless he has to. (*Id.*) He lives with his wife, who does most of the household work and cooking. (R. 38.)  He used to have hobbies, such as fishing and hunting, but had to stop those about five years ago. (R. 40.)  Plaintiff reported that his prior jobs were general farm work, general construction work, butcher work, and boat building. (R. 43–44.)

Vocational expert Dana Lessne ("VE") also testified at the hearing. (R. 42.) The VE classified Plaintiff's reported former occupations as (1) boat rigger, (2) meat butcher, (3) construction worker II, and (4) general farm worker I. (R. 44.) The ALJ posed several hypotheticals to the VE:

> Q. I'm going to have a few hypothetical questions for you. The first is, let's take a hypothetical 49-year-old claimant. Limited education. With the vocational background that you just outlined. Who is limited to lifting 20 pounds, occasionally 10 pounds frequently. Sitting, standing, and walking for up to six hours in an eight hour work day. Limited to only occasional climbing. Must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, fumes, odors, gases, poor ventilation, and hazards such as types of machinery. Would that individual be able to perform the claimant's past work?

A. No.

Q. What jobs of [INAUDIBLE] would fulfill the requirements?

A. Clean up housekeeper. 323.687-014. Light, with an SVP of 2. 235,051 nationally. Advertising material distributor. 230.687-010. Light, with an SVP of 2. 58,358 nationally. Office helper. 239.567-010. Light, with an SVP of 2. 76,830.

Q. If I took the same hypothetical claimant, but added additional limitations. Instead of being able to stand and walk for up to six hours in an eight hour work day, the claimant was only able to stand and walk for up to two hours in an eight hour work day, but all the other strictures remained, would that impact the jobs that you just gave me?

A. Yes. It would eliminate them.

Q. Do you have any other jobs to replace them in the less than a full range of light category?

A. No. That would be sedentary.

Q. Okay, and can you tell me what those jobs are?

A. Sedentary jobs?

Q. Yes, sir.

A. [INAUDIBLE] top clerk. 205.367-014. Sedentary, with an SVP of 2. 60,237 nationally. Escort vehicle driver. 919.663-022. Sedentary, with an SVP of 2. 22,647 nationally. Surveillance system monitor. 379.367-010. Sedentary, with an S[V]P of 2. 13,830.

Q. And if I added even further limitations to standing and walking, for up to two hours in an eight hour work day, sitting for only up to four hours in an eight hour work day. How would that affect the jobs that you gave me?

A. Could you repeat that?

Q. Standing and walking for up to two hours. Sitting for up to six – sorry. Sitting for up to four.

A. There would be no work.

Q. Okay.

(R. 44–46.)

At the hearing, Plaintiff's attorney, Theodore Burt, further posed the

following questions to the VE:

Q. The claimant with the jobs that you've identified. Any transferrable skills?

A. There would be no transferrable skills, because they were unskilled jobs.

Q. And if the hypothetical person, in any of the hypotheticals presented by her honor, if that person required unscheduled breaks, say an additional thirty minutes in the afternoon, thirty minutes in the morning, would that person be employable?

A. No.

Q. Okay. If the hypothetical person would miss at least one day per week of work, is that person employable?

A. No.

Q. Okay. Thank you.

(R. 47.) Mr. Burt also noted that during the interim from Plaintiff's onset until now, Plaintiff has reached the age of fifty. (*Id.*) Plaintiff's attorney said that under Rule 201.10, "even if there was a finding that he could do sedentary work, it should be under the grids that he should be found disabled as having reached age fifty." (R. 47–48.)

## D.  The ALJ's Findings

The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2013. (R. 16.) The ALJ further determined that Plaintiff had not engaged in substantial gainful activity since March 5, 2011. (*Id.*) The ALJ found that Plaintiff had the following severe impairments: hypertension, circulatory disease, and ischemic heart disease. (*Id.*) The ALJ went on to find at step three of the sequential evaluation that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (*Id.*)

With respect to Plaintiff's residual functional capacity at step four of

the sequential evaluation, the ALJ determined that Plaintiff retained the

residual functional capacity ("RFC") to perform light work as defined in 20

C.F.R. § § 404.1567(b) and 416.967(b). (R. 16–17.)  The ALJ found that

Plaintiff could sit, stand, and walk six hours in an eight-hour workday,

occasionally lift 20 pounds, and frequently lift 10 pounds. (R. 17.)  Further,

the ALJ found that Plaintiff could occasionally climb, but needs to avoid

concentrated exposure to extreme cold, heat, wetness, humidity, vibration

and fumes, as well as avoid unprotected heights and moving machinery.

(*Id.*)

The ALJ concluded that Plaintiff's medically determinable

impairments could reasonably be expected to cause Plaintiff's alleged

symptoms, but that Plaintiff's statements concerning the intensity,

persistence and limiting effects of his symptoms were not entirely credible

for the reasons discussed in her decision. (R. 19.) The ALJ concluded at

step four that Plaintiff was unable to perform any past relevant work. (R.

20.) The ALJ then went on to step five of the sequential evaluation and

noted that Plaintiff was forty-nine years old on the alleged disability onset

date, which is defined as a "younger individual," but Plaintiff changed age

categories to closely approaching "advanced age." (*Id.*)  Relying upon the

testimony of the VE, the ALJ concluded that an individual, such as Plaintiff,

could perform the positions of cleaner, advertising materials distributor and

office help, which jobs exist in significant numbers in the national economy.

(*Id.*) The ALJ, therefore, concluded that Plaintiff had not been under a

disability from March 5, 2011, through the date of her decision. (R. 21.)

## IV.  DISCUSSION

Plaintiff raises two issues on appeal: (1) whether the ALJ erred in

finding that Plaintiff is capable of work at the light exertional level; and (2)

whether the ALJ erred in applying the medical vocational guidelines. (ECF

No. 14 at 1, 9.)

## A.    Substantial evidence supports the ALJ's finding that Plaintiff is capable of work at the light exertional level.

Plaintiff contends that the ALJ erred at Step Four of the sequential

evaluation in determining that Plaintiff is capable of work at the light

exertional level.

At Step Four the ALJ must assess the claimant's RFC and his ability

to return to her past relevant work. § 404.1520(a)(4)(iv). The ALJ must take

the claimant's medical evidence and other evidence into consideration in

his RFC analysis. § 404.1520(e). If a claimant cannot return to his past

relevant work, the ALJ moves onto Step Five to determine if the claimant

can adjust to other work. *Id.*; *Phillips v. Barnhart*, 357 F.3d 1232, 1238

(11th Cir. 2004).

   In this case, at Step Four the ALJ determined that Plaintiff could not

return to her past relevant work, but that he has the RFC to perform "light

work." (R. 16–17, 20.)  The ALJ specifically concluded that,

> the claimant could sit, stand and walk six hours in an eight-hour
> workday, lift 20 pounds occasionally and 10 pounds frequently.
> The claimant has a limited education. He could occasionally
> climb. The claimant needs to avoid concentrated exposure to
> extreme cold, heat, wetness, humidity, vibration and fumes.
> The claimant needs to avoid unprotected heights and moving
> machinery.

(R. 17.)

> According to the social security regulations, "light work" is defined as:

> lifting no more than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds. Even though the
> weight lifted in a particular light job may be very little, a job is in
> this category when it requires a good deal of walking or
> standing—the primary difference between sedentary and most
> light jobs. A job is also in this category when it involves sitting
> most of the time but with some pushing and pulling of arm-hand
> or leg-foot controls, which require greater exertion than in
> sedentary work . . . .

SSR 83-10. Additionally, SSR 83-10 defines "frequent" as:

occurring from one-third to two-thirds of the time. Since
frequent lifting or carrying requires being on one's feet up to
two-thirds of a workday, the full range of light work requires
standing or walking, off and on, for a total of approximately 6
hours of an 8-hour workday. Sitting may occur intermittently
during the remaining time. The lifting requirement for the
majority of light jobs can be accomplished with occasional,
rather than frequent, stooping. Many unskilled light jobs are
performed primarily in one location, with the ability to stand
being more critical than the ability to walk. They require use of
arms and hands to grasp and to hold and turn objects, and they
generally do not require use of the fingers for fine activities to
the extent required in much sedentary work.

The ALJ gave a lengthy and detailed explanation as to why she

determined that Plaintiff could perform "light work."  While the ALJ did not

discount entirely Plaintiff's severe impairments, she noted that Plaintiff's

"statements concerning the intensity, persistence and limiting effects of

these symptoms are not entirely credible for the reasons explained in this

decision." (R. 19.)  Whether objective medical impairments could

reasonably give rise to the alleged pain is a question of fact for the

Commissioner and the district court should only review the finding to

ensure that the Commissioner's finding is supported by substantial

evidence. *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986). In this

case, an independent review of the record supports the ALJ's finding.

The record reflects that at Plaintiff's first visit on February 17, 2012,

he was in no apparent distress, had a regular heart rate, and had no

edema. (R. 308.) Two days later, on February 19, 2012, Plaintiff had a 72%

EF. (R. 309, 327.)  While Plaintiff's EF decreased to 45% on March 13,

2012, it then increased to 50% on May 9, 2012. (R. 328, 331.) After

Plaintiff's May 9, 2012 heart catherization, on May 18, 2012, he reported

no more chest pains. (R. 321.)  Plaintiff's exam on July 3, 2012 was rather

unremarkable: no cardiovascular pain, no irregular heartbeat, no difficulty

breathing, a regular cardiovascular rate, full range of motion in all his

extremities, 5/5 muscle strength, and no swelling. (R. 348–51.)

On November 19, 2012, Plaintiff again reported no chest pain, and

had a normal cardiovascular rate and rhythm with no murmurs. (R.

365–68.)  Approximately six months later, on May 6, 2013, Plaintiff again

reported chest pain, but said it resolved on its own. After being prescribed

naproxen for the chest pain, on June 3, 2013, Plaintiff reported that the

chest pain had resolved from the naproxen and had not recurred. (R.

385–88.)  Notably, however, at Plaintiff's hearing—and in contrast to the

medical records— Plaintiff testified that he had chest pain about twice a

day three or four days per week and had just started the naproxen, but that

it had only been approximately two weeks and so far it had not done

anything to help. (R. 35, 41.)

The ALJ noted other inconsistencies between Plaintiff's testimony and the medical evidence. For example, while Plaintiff self-reported exercising for 30 minutes three times a week, (R. 355), at the hearing, Plaintiff testified that walking made his symptoms worse. Further, although Plaintiff testified that sitting also made his symptoms worse, the medical records offer very little evidence regarding Plaintiff's back pain other than noting a "history" of back pain and herniated discs. The medical records from the LCHD also gave Plaintiff the go ahead to be active physically and encouraged Plaintiff to walk and do yard work. (R. 365–67.) The LCHD even noted a goal for Plaintiff to lose weight and exercise. (*Id.*)

Plaintiff says there is no substantial evidence supporting the finding that Plaintiff remains employable because Plaintiff's treating physician—Dr. Qamar—opined that Plaintiff would miss four or more days of work per month. An ALJ may disregard a treating physician's opinion in a social security disability proceeding as long as there is good cause and the ALJ clearly articulates the reasons for doing so. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). "Good cause exists 'when the: (1) treating physician's opinion was not bolstered by the evidence; (2)

evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.'" *Id.* (quoting *Phillips*, 357 F.3d at 1241).

While there is no dispute that Dr. Qamar is Plaintiff's treating physician, the ALJ gave Dr. Qamar's opinion "some" weight, as opposed to substantial or considerable weight. (R. 20.) In doing so, the ALJ adopted Dr. Qamar's opinion that Plaintiff should be limited to low stress jobs that do not require extensive physical exertion. The ALJ did not, however, fully adopt Dr. Qamar's opinion.

Specifically, the ALJ explained that although Dr. Qamar was Plaintiff's treating physician, Dr. Qamar's "treatment notes show improvement, encourages some activity and the claimant's activities of daily living is compatible with the limitations specified in the claimant's residual functional capacity." The ALJ noted that while "[n]ormally a treating physician's opinion is accorded great weight; however, the opinion must be supported by the overall medical evidence." (R. 19.) In discussing her reasons for discounting a potion of Dr. Qamar's opinion the ALJ said:

> Dr. Asad[5] indicated that the claimant's chest pain had resolved following his cardiac catherization. The claimant also reported that his chest pain had resolved after taking Naprosyn. He had occasional chest pain on exertion. Moreover, his cardiac catherization showed only mild congestive heart disease. The claimant indicated on several occasions that he did not have pain. Physical examination findings show normal heart rate and rhythm. He has full range of motion in all his extremities with 5/5 muscle strength. The claimant's physician and the health department encouraged the claimant to walk and perform yard work. The claimant does do some gardening for his wife. Dr. Asad did indicate the claimant could work if he did not exert himself, which would be consistent with light exertion.

(R. 19–20.) The ALJ's discussion is sufficient to satisfy the Eleventh Circuit's "good cause" standard because Dr. Qamar's opinion was not bolstered by the evidence, the evidence supported a contrary finding, and Dr. Qamar's opinion was to some degree inconsistent with his own medical records. *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d at 1179.

 Although Dr. Qamar opined that Plaintiff would have to miss more than four days of work per month, as the ALJ explained, Dr. Qamar opined that Plaintiff "may be able to perform work not requiring extensive physical exertion." (R. 335, 338.)  Additionally, while Dr. Qamar opined that Plaintiff could only stand for 30 minutes because of his back pain, the only mention

---

[5] The ALJ's opinion incorrectly refers to Dr. Asad Qamar as Dr. Asad.

of back pain throughout Plaintiff's medical records is a note of a history of

back pain and herniated discs. Despite this passing reference to a history

of back pain, Plaintiff's medical records are devoid of any evidence of

testing or treatment for back pain.

 Further, on May 18 2012—the last day Plaintiff treated with Dr.

Qamar—Dr. Qamar noted that Plaintiff's chest pain had resolved after his

catherization. (R. 335.) Yet, two months later in July 2012, after Plaintiff

started treating at the LCHD, Dr. Qamar's assessment noted that Plaintiff

had occasional chest pain. (R. 341.)

Dr. Qamar's opinion is also inconsistent with Plaintiff's activities of

daily living, including Plaintiff ability to garden, walk, and exercise three

times a week for thirty minutes. The opinion is also inconsistent with the

LCHD medical records which gave Plaintiff the "green light" to be active

physically, and encouraged Plaintiff to walk and perform yard work. (R. 41,

355, 367.)

Lastly, and as previously discussed, Plaintiff repeatedly reported no

chest pain, consistently had a regular heart rate, had full range of motion in

his extremities, had full muscle strength, reported exercising three times a

week, and was encouraged to continue exercising. For all of these reasons

the ALJ had good cause to accord only some, and not substantial weight to

Dr. Qamar's opinion.

While only according some weight to Dr. Qamar's opinion, the ALJ

properly gave great weight to Dr. Patel's opinion in determining Plaintiff's

RFC. State agency consultants' opinions may be entitled to greater weight

than the opinions of treating sources if their opinions are supported by the

evidence in the record. *See* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2)(I);

SSR 96-6p.  After reviewing Plaintiff's file in August 2012, after Dr.

Qamar's assessments, Dr. Patel opined that Plaintiff was capable of a

reduced range of light exertional activity. (R. 96.) In support of her

conclusion, Dr. Patel pointed to Plaintiff's occasional complaints of chest

pain, varying EF percentages that ranged from 45 to 75%, regular heart

rate and rhythm, no joint abnormalities or swelling, full range of motion and

5/5 muscle strength in all extremities, and findings of mild coronary artery

disease, hypertension, hyperlipidemia, chronic back pain, and leg and hip

discomfort.

Dr. Patel also noted that Dr. Qamar's opinion was more restrictive

than her findings and was "without substantial support from other evidence

of record, which renders it less persuasive." (R. 95.) In accordance with Dr.

Patel's opinion that Plaintiff could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand and/or walk for 6 hours, sit for 6 hours, and otherwise had no pushing and/or pulling limitations, the ALJ determined that Plaintiff could perform light work with limitations regarding climbing, avoiding certain environmental factors, and avoiding unprotected heights and moving machinery. (R. 16–17, 92); *see also* SSR 83-10 (defining "light work").

The Court, therefore, concludes that the ALJ did not err in assigning greater weight to Dr. Patel's opinion than to Dr. Qamar's opinion. *See Ogranaja v. Comm'r of Soc. Sec.,* 186 F. App'x 848, 850–51 (11th Cir. 2006) (substantial evidence supported ALJ's decision to assign greater weight to state agency physician opinions where opinions were supported by and consistent with the record as a whole).  Accordingly, substantial evidence supports the ALJ's RFC finding.  Considering substantial evidence supports the ALJ's Step Four analysis, the ALJ was correct in moving on to Step Five to determine if Plaintiff could perform other work.[6]

_____

[6] In Plaintiff's lengthy and compound presentation of the issue on appeal Plaintiff argues that substantial evidence does not support the ALJ's finding that Plaintiff remains employable despite the VE's testimony to the contrary. The VE's testimony in this regard was based upon a hypothetical of Plaintiff's RFC that was not adopted by the ALJ. Specifically, Dr. Qamar opined that Plaintiff would sometimes need to take

**B.    The ALJ appropriately relied upon the vocational expert's testimony at Step Five of the analysis.**

Plaintiff also argues that because substantial evidence does not support the ALJ's RFC finding, the ALJ improperly applied the Medical Vocational Guidelines to Plaintiff's case at Step Five. (ECF No. 14 at 1, 6.) Plaintiff's argument is flawed in two respects.

First, as explained above, substantial evidence supports the ALJ's RFC finding. Second—and contrary to Plaintiff's argument—at step five the ALJ did not rely upon the Medical Vocational Guidelines in determining whether Plaintiff was disabled. Rather the ALJ only used the Medical Vocational Guidelines as a framework but relied upon the testimony of the VE that Plaintiff could perform other work in the national economy.

"There are two avenues by which the ALJ may determine whether the

---

unscheduled breaks during an 8-hour workday and would have to miss more than four days of work per month as a result of Plaintiff's impairments. (R. 336, 338.) According to the VE, a person is not employable who would sometimes need to take unscheduled breaks during an 8-hour workday, such as thirty minutes in the morning and thirty minutes in the afternoon, and would have to miss more than four days of work per month. (R. 47.)  The ALJ did not give substantial weight to this portion of Dr. Qamar's opinion. By contrast, the VE testified that there were jobs in the national market that a hypothetical claimant could perform in line with Dr. Patel's restrictions: limited to lifting 20 pounds, occasionally 10 pounds frequently, sitting, standing, and walking for up to six hours in an eight hour work day. (R. 44–45.) Because substantial evidence supports the ALJ's finding regarding Plaintiff's ability to perform light work in accordance with Dr. Patel's assessment, the ALJ's reliance upon this hypothetical, as opposed to the more limiting hypothetical, was proper.

claimant has the ability to adjust to other work in the national economy.

The first is by applying the Medical Vocational Guidelines." *Phillips*, 357

F.3d at 1239.

> The Medical Vocational Guidelines ("grids") provide applicants with an alternate path to qualify for disability benefits when their impairments do not meet the requirements of the listed qualifying impairments. The grids provide for adjudicators to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience. Each of these factors can independently limit the number of jobs realistically available to an individual. Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled."

*Id.* at 1240; *see also* 20 C.F.R. § 404, subpt. P, app. 2.

> The other means by which the ALJ may determine whether the claimant has the ability to adjust to other work in the national economy is by the use of a vocational expert. A vocational expert is an expert on the kinds of jobs an individual can perform based on his or her capacity and impairments. When the ALJ uses a vocational expert, the ALJ will pose hypothetical question(s) to the vocational expert to establish whether someone with the limitations that the ALJ has previously determined that the claimant has will be able to secure employment in the national economy.

*Id.* at 1240.

At Step Five the ALJ did not—and was not required to— rely upon

the Grids. Instead, because the ALJ found that Plaintiff's ability to perform

all or substantially all of the requirements of "light work" was impeded by

additional limitations,[7] the ALJ was required to consult a VE. *See Francis*, 749 F.2d at 1566.  Although the ALJ discussed the Grids as a framework in her decision, she correctly utilized and relied upon the testimony of a VE.

In consulting the VE, the ALJ properly posed hypothetical questions to the VE, taking into account Plaintiff's age, education, past relevant work, and exertional limitations to determine whether other work exists in significant numbers for Plaintiff. (R. 21, 44–45.) "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Wilson*, 284 F.3d at 1227; *Winschel*, 631 F.3d at 1180. The VE's testimony constitutes substantial evidence in this case because the hypothetical question to the VE encompassed all of the limitations in the ALJ's RFC finding. (R. 16–17, 44–45.) The ALJ properly relied upon the VE's testimony that jobs exist in the national economy for a claimant with Plaintiff's restrictions and properly determined that Plaintiff was not

---

[7] The ALJ determined that Plaintiff has the following postural and environmental restrictions: occasional climbing, avoiding concentrated exposure to extreme cold, heat, wetness, humidity, vibration, and fumes, and avoiding unprotected heights and moving machinery. (R. 16–17, 21, 44–45.)

disabled.[8]

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the

decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida, on the 25th day of April, 2016.

*s / Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations**

---

[8] The ALJ explained in her written decision that she took into account that Plaintiff changed age category from "younger individual" to "closely approaching advanced age" between the alleged disability onset date and the time of filing. Additionally, the ALJ noted that Plaintiff has a limited education and is able to communicate in English. Further, the ALJ noted that Plaintiff's "ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations." (R. 21.) Thus, "[t]o determine the extent to which these limitations erode the unskilled light occupational base," the ALJ "asked the VE whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity." (*Id.*) As previously discussed, the VE testified that there were jobs that exist in the national economy that an individual like Plaintiff could perform. (R. 21, 44–46.) The  ALJ determined that the VE's testimony was consistent with the information in the Dictionary of Occupational Titles, and therefore, concluded that Plaintiff was not disabled. (R. 21.)

as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.